

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2005

# Lexington Ins Co v. W PA Hosp

Precedential or Non-Precedential: Precedential

Docket No. 04-1642

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Lexington Ins Co v. W PA Hosp" (2005). *2005 Decisions.* Paper 485.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/485

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-1642

———

LEXINGTON INSURANCE COMPANY

v.

WESTERN PENNSYLVANIA HOSPITAL; ELIZABETH
LIEB; HARRY LIEB, h/w, Parents, and Natural Guardians of
KATHRYN LIEB, a Minor

Western Pennsylvania Hospital,
*Appellant*

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 03-cv-1675)
District Judge: Honorable Thomas M. Hardiman

———

Argued June 7, 2005
Before: FUENTES, VAN ANTWERPEN, and BECKER,
*Circuit Judges*.

(Filed:   September 9, 2005)

OPINION OF THE COURT

———

THOMAS E. BIRSIC (ARGUED)
CHARLES E. McCHESNEY II
Kirkpatrick & Lockhart LLP

Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
 *Attorneys for Appellant*

EDWARD B. WOOD
Wood Group, P.C.
Two Chatham Center, Suite 1050
Pittsburgh, PA 15219
 *Attorney for Appellant*

STEPHEN A. COZEN (ARGUED)
DEBORAH M. MINKOFF
NANCY STUART PORTNEY
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
 *Attorneys for Appellee*


BECKER, *Circuit Judge*.

Lexington Insurance Company ("Lexington") sought a declaratory judgment in the District Court that it is not liable for payment of a medical malpractice claim against its insured, Western Pennsylvania Hospital ("West Penn"), because West Penn notified Lexington of the claim more than a year and a half after the policy period ended. The District Court found for Lexington, determining that the claim was governed by Lexington's excess coverage provision created by Endorsement #007 of the policy, which provides follow-form, claims-made coverage; and that the policy required West Penn to notify Lexington of any claims before the close of the policy period, which it failed to do.

West Penn relies on Endorsement #001, which provided that the Lexington policy would apply immediately over the coverage limit of the Pennsylvania CAT Fund (described *infra* p.4). West Penn contends that Endorsement #007 and Endorsement #001 are mutually exclusive, such that, where, as here, the CAT Fund took responsibility for paying the underlying claim, the notice provisions

2

contained in Lexington's occurrence policy—which permits a more flexible time limit for reporting claims than under Endorsement #007—should apply instead of Endorsement #007's notice provisions. The District Court, however, rejected West Penn's argument that Endorsement #001 superseded Endorsement #007, and held that West Penn's failure to timely report the claim relieves Lexington of liability under the terms of the policy. For the reasons that follow, we agree with the District Court that the two Endorsements are complementary and not exclusive, and that Endorsement #007's time bar applies.

In view of this conclusion, this appeal turns on whether West Penn gave Lexington notice of the claim during the policy period. West Penn's General Counsel admitted that she did not report the Lieb claim until February 12, 2003, well after the policy period, and the first correspondence in the record between West Penn and Lexington regarding the Lieb claim is a letter dated February 12, 2003. Nevertheless, West Penn relies on an internal Lexington document, called an "HPL Create Sheet," which contained a notation that arguably suggests that West Penn reported the medical malpractice claim to Lexington during the policy period. While we find this document to be (barely) admissible evidence, notwithstanding strong objections to it on authentication and hearsay grounds, we conclude that its probative value is too slight to enable West Penn to survive summary judgment.

Neither is West Penn's notice contention supported by the speculative affidavit and deposition testimony of West Penn's then-Assistant General Counsel, Karen Barringer, who merely *assumed* that Lexington had been made aware of the claim. This absence of evidence, coupled with the concession of West Penn's General Counsel that West Penn did not provide notice during the policy period, compels the conclusion that a reasonable jury could not find compliance with the notice requirement. We will therefore affirm the order of the District Court granting summary judgment in favor of Lexington.

## I. Factual and Procedural Background

On May 25, 2001, Elizabeth and Harry Lieb filed a medical

3

malpractice claim in state court against West Penn, alleging that, eleven years earlier, the Lieb's daughter, Kathryn, suffered long-term brain damage as a result of West Penn's negligent delay in performing a caesarean section. West Penn submitted a "Notice of Claim" to its primary professional liability insurer, PHICO Insurance Company ("PHICO"), under the terms of its policy. PHICO provided West Penn with institutional professional liability coverage for medical incident claims made against West Penn and reported to PHICO between January 1, 2001, and January 1, 2002 ("the PHICO policy").

The PHICO policy was a "claims-made" policy, which provided coverage for any claim actually reported during the policy period, even if the incident occurred in prior years. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n.3 (1978). The PHICO policy states that it will pay for damages "caused by a medical incident which occurs on or after the Initial Effective Date . . . and *for which claim is reported to Company during the policy period*." (emphasis added).

PHICO, however, did not ultimately pay the Lieb claim because it referred the matter to the Medical Professional Liability Catastrophe Fund ("the CAT Fund"), which is governed by the Pennsylvania Health Care Services Malpractice Act, 40 Pa. Stat. Ann. § 1301.101 *et. seq*. When a claim is made against a health care provider more than four years after the incident giving rise to the claim, the CAT Fund takes responsibility, in the place of a primary insurer, for defending the claim and for indemnifying the health care provider for the first one million dollars. Such claims are commonly referred to as "605 claims." Because the Lieb claim was asserted more than four years after the occurrence giving rise to it, the CAT Fund assumed PHICO's responsibility for defending West Penn in the ensuing litigation. As it emerged, however, the damages resulting from the Lieb claim exceeded the one million dollars of CAT Fund coverage.

During this same period, Lexington provided two types of

coverage to West Penn.[1]  First, it provided liability coverage on an occurrence basis as set forth in Lexington's pre-printed policy form ("Lexington's occurrence policy").  In contrast to a claims-made policy, an occurrence policy provides coverage if the incident giving rise to the claim occurred during the policy period, regardless of when the claim is ultimately brought against the insured, provided the claim is reported to the insurer "as soon as practicable."  *See City of Harrisburg v. Int'l Surplus Lines Ins. Co.*, 596 F. Supp. 954, 960-61 (M.D. Pa. 1984), *aff'd w/o opinion* 770 F.2d 1067 (3d Cir. 1985).

Second, Lexington provided excess coverage for medical professional liability over and above the primary insurer's policy limits ("Lexington's excess policy").  This expansion of coverage was effected by Endorsement #007 which provided excess coverage to West Penn on proof that it had purchased primary medical liability coverage.  This excess policy was, by its terms, "follow-form, claims-made" coverage, meaning that the Lexington policy incorporated the terms and conditions of the primary PHICO policy for medical malpractice claims.  As mentioned above, the PHICO policy extended coverage to claims that were both "made and reported" during the policy period, even if the injury occurred prior to the policy period.  Because the Lieb claim exceeded the coverage limits under the CAT Fund and the PHICO policy, Lexington's excess policy was implicated.

Endorsement #007 of the Lexington Policy provided, in relevant part:
Medical Professional Liability–Follow Form

PROVIDES CLAIMS-MADE COVERAGE—PLEASE READ CAREFULLY
. . . .
Insuring Agreement IA–Medical Professional Liability Coverage

---

[1]The Lexington policy consists of a Declarations page, a Forms Schedule, a Schedule of Underlying Insurance, a pre-printed policy form, and twelve endorsements.

Insofar as coverage is available to the Insured in the underlying insurance as set forth in the Schedule of Underlying Insurance, this policy applies to liability arising out of medical incidents. All of the terms and conditions of said underlying insurance shall apply to this insuring agreement except as otherwise expressly stated herein.

The dispute on appeal arises out terms of Endorsement #007 and the interplay between Endorsement #007 and Endorsement #001, described below.

The 2001 Lexington Policy expired on December 31, 2001. On the last day of the PHICO and Lexington policy period, West Penn advised Lexington of 23 claims, but Lexington contends that the Lieb claim was not among those discussed. Lexington submits that West Penn did not give notice of the Lieb claim until February 12, 2003, more than a year after the policy ended. As West Penn failed to notify Lexington of the Lieb claim until after the policy terminated, Lexington asserts it should not be required to cover the claim.

Lexington filed suit against West Penn seeking a declaratory judgment that it could deny coverage for the Lieb claim. On cross-motions for summary judgment, the District Court granted summary judgment for Lexington. The District Court held that the Lexington insurance policy was unambiguous in requiring West Penn to provide notice of medical malpractice claims during the policy period, as required by Endorsement #007's follow-form, claims-made language. Because the Court found that West Penn had conceded that it did not report the Lieb claim to Lexington until February 12, 2003, it held as a matter of law that Lexington was not required to cover the claim. West Penn timely moved for reconsideration, which was denied.

West Penn appeals the District Court's grant of summary judgment, asserting that (1) the Lexington policy did not require notice of the claim to be given during the life of the policy; and alternatively, that (2) there was a genuine issue of material fact as to whether West Penn gave Lexington notice prior to December

31, 2001. We describe the basis for jurisdiction and our standard of review in the margin.[2]

## II. Was West Penn Required to Give Notice During the Policy Period?

### A.

West Penn disputes that it was required to give notice to Lexington during the policy period. As this is a diversity case, we must apply Pennsylvania law to interpret the Lexington policy. Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Id.* (quoting *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n, Ins. Co.* 517 A.2d 910, 913 (1986)).

---

[2]The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and the citizenship of the parties is diverse—Lexington is a Delaware corporation with its principal place of business in Massachusetts, and West Penn is a Pennsylvania corporation with its principal place of business in Pennsylvania. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Our review of a grant of a summary judgment motion is plenary, and we apply the same standard as the District Court: Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, however, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*

7

"Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

West Penn's primary argument is that Endorsement #007's follow-form provision does not apply to the Lieb claim because the CAT Fund substituted for PHICO in this case. West Penn first points to the portion of Endorsement #007 that provides, "[i]nsofar as coverage is available to the Insured in the underlying insurance," to argue that Endorsement #007's follow-form provision only applies when the underlying medical malpractice claim is actually paid by the primary policy. West Penn contends that since the CAT Fund assumed responsibility for the Lieb claim, coverage was not "available" under the PHICO policy, and thus Endorsement #007 does not apply.

Additionally, West Penn points to Endorsement #001, which it contends renders Endorsement #007, and thus terms of the PHICO policy, inapplicable to "605 claims" like the Lieb claim. Endorsement #001, entitled "Coverage Amendment—Section 605 Claims," provides:

> In the event underlying insurance shall not be applicable to any claim for the reason that the [CAT] Fund shall assume or be required to assume primary responsibility for payment . . . ,coverage under this policy as to such claim shall apply as excess immediately over the limit of liability of the [CAT] Fund.
>
> All other terms and conditions remain unchanged.

West Penn argues that Endorsement #007 and Endorsement #001 are mutually exclusive provisions, such that, where the CAT Fund assumes responsibility for payment, the notice provisions contained in Lexington's occurrence policy, rather than PHICO's notice requirements, should control.

Condition F of the pre-printed form, *see supra* note 1, sets

8

forth the notice provisions for Lexington's occurrence policy. Entitled "Duties In The Event Of An Occurrence, Claim Or Suit," Condition F states that West Penn must notify Lexington "as soon as practicable of an Occurrence which may result in a claim under this policy." Relying on Condition F, West Penn contends that it was required to report the Lieb claim "as soon as practicable," rather than during the policy period, as would have been required under the PHICO policy.

Lexington responds that Endorsement #001 and #007 are complementary, not exclusive, and that the policy must be read as a whole so as to give effect to both Endorsements. In Lexington's submission, the purpose of Endorsement #007 was to provide medical professional liability coverage to West Penn so long as West Penn purchased primary coverage. Endorsement #001, it is contended, served a different purpose: it recognized that § 605 claims, like the Lieb claim, are particularly susceptible to "drop down" coverage disputes because the indemnity available from the CAT Fund may be less than the underlying policy's limits.[3] Endorsement #001 avoids this problem by providing that "coverage under this policy as to such claim" will apply "as excess immediately over the limit of liability" of the CAT Fund; it does not, however, negate the policy requirements applicable to medical professional liability coverage.

The District Court found Lexington's arguments persuasive, holding:

Although the Court agrees that Endorsement #001 requires

---

[3]A "drop down" coverage dispute arises when an excess liability insurance carrier disputes its duty to "drop-down" in order to provide coverage below the primary insurer's policy limits. Such disputes are common when the primary insurer becomes insolvent, *see, e.g.*, *J. Kinderman & Sons, Inc. v. United Nat. Ins. Co.*, 593 A.2d 857, 858 (Pa. Super. Ct. 1991), but also could occur when the CAT Fund takes responsibility for a claim and provides less coverage than the primary policy.

Lexington to provide umbrella coverage to West Penn for liability over the CAT Fund's limit, nothing in Endorsement #001 suggests that Endorsement #007 is ineffective when Endorsement #001 is implicated. Contrary to West Penn's claims, . . . these two endorsements are complementary. Endorsement #007 requires Lexington to provide excess claims-made professional liability coverage while Endorsement #001 makes explicit that Lexington remains liable for coverage even if the CAT Fund supplants PHICO as underlying insurer.

In support of this conclusion, the District Court also reasoned that of Condition F's "'occurrence' language," which permits reporting a claim "as soon as practicable of an Occurrence which may result in the claim under this policy," would be "inconsistent with the follow form, claims made language in Endorsement #007 and the PHICO policy," which would clearly require reporting during the policy period.

## B.

We agree with the District Court that the logical reading of the Lexington policy is to find Endorsement #001 and #007 to be complementary rather than mutually exclusive. First, we look to the plain language of Endorsement #007. *See Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 901 (3d Cir. 1997) ("If . . . the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement."). Endorsement #007 is titled "Medical Professional Liability—Follow Form" and it states in all capital letters "PROVIDES CLAIMS-MADE COVERAGE—PLEASE READ CAREFULLY." This provision makes clear that medical malpractice coverage was provided in a follow-form, claims-made fashion.

Moreover, Endorsement #007 states that any exceptions to this follow-form coverage would need to be "expressly stated." Endorsement #001 does not appear to constitute such an express exception to Endorsement #007, given that Endorsement #001 does not directly mention Endorsement #007 or its follow-form

10

notice requirement, nor does Endorsement #001 clearly implicate the terms of Endorsement #007. Thus, the absence of an express exception in Endorsement #001 bolsters reading Endorsement #007 and #001 as complementary rather than mutually exclusive. *See Pa. Dept. of Transp. v. Manor Mines, Inc.*, 565 A.2d 428, 432 (Pa. 1989) ("[E]ffect must be given to all provisions in the contract.").

Second, it would strain both logic and insurance industry practice to extend Condition F's "as soon as practicable" notice provision to § 605 claims like the Lieb claim. As the District Court recognized, Condition F clearly speaks in terms of occurrence-based, *not* claims-made, coverage. Lexington's pre-printed policy form provides only occurrence-based coverage, which is clearly inapplicable to the Lieb claim, where the incident giving rise to the claim occurred in 1989 or 1990, well before the effective date of the Lexington policy. Thus, Lexington persuasively argues, "West Penn's proffered interpretation renders Endorsement #001 nonsensical because the remaining 'Lexington Policy terms and conditions' would not provide coverage for the Lieb claim—or indeed any claim assumed by the CAT Fund." That is because, by its very nature, the CAT Fund only covers claims that occur *more than four years* prior to the claim, while an occurrence policy covers only those incidents that occur *during* the policy period.

To extend Condition F's occurrence-based notice provisions to a claim that occurred eleven years prior to the policy period would make little sense given the important differences in the role played by claims-made and occurrence-based policies for both the insurer and the insured. We have noted the importance of these distinctions:

> Notice provisions serve different purposes in occurrence and claims-made policies. In an occurrence policy, notice provisions are included to help the insurer investigate, settle, and defend claims; they do not define coverage . . . . "By contrast, the event that invokes coverage under a 'claims made' policy is transmittal of notice of the claim to the

11

insurance carrier . . . . Thus, an extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy."

Claims-made policies are less expensive because underwriters can calculate risks more precisely since exposure ends at a fixed point. Extension of time periods would significantly increase both the risk to insurers and the cost to insureds. If the potential exposure period is extended . . . claims-made policies must necessarily become more expensive.

*American Cas. Co. v. Continisio*, 17 F.3d 62, 68-69 (3d Cir. 1994) (quoting *Zuckerman v. National Union Fire Ins. Co.*, 495 A.2d 395, 406 (1985)) (internal citations omitted). By providing claims-made coverage for medical professional liability, Endorsement #007 establishes a category of coverage *not* available under Lexington's occurrence policy because occurrence-based policies do not cover claims, like the Lieb claim, where the incident giving rise to the claim occurred *before* the policy period.

Furthermore, under West Penn's proposed interpretation of the policy, Endorsement #001 would expand the coverage under Lexington's occurrence policy to claims that occurred more than four years prior to the policy date *and* would allow West Penn to report such claims after the policy period. Such an expansion of coverage would give West Penn the best of both the occurrence and claims-made worlds when it comes to "605 claims." The language of Endorsements #001 and #007 does not support this result.

In contrast to West Penn's strained reading of Endorsement #001, we note Endorsement #001's obvious and significant purposes: (1) to ensure that the excess policy would still apply in the event that the CAT Fund assumed liability, and (2) to prevent a dispute in the event that the CAT Fund payment limits are lower than PHICO's policy limits. Indeed, West Penn does not address

12

what appears to be the operative portion of Endorsement #001, which provides that "coverage under this policy as to such claim shall apply as excess immediately over the limit of liability of the [CAT] Fund." Thus, the District Court's interpretation is the most logical reading of the policy: Endorsement #001's purpose is simply to make clear that the excess claims-made coverage will apply in the event the CAT Fund takes responsibility for payment of a claim.[4]

Notwithstanding this conclusion, we acknowledge the facial appeal of West Penn's argument that the introductory phrases of Endorsements #007 and #001 render the Endorsements mutually exclusive. Endorsement #007 states that it applies only "[i]nsofar as coverage is available. . . in the underlying insurance." Endorsement #001, on the other hand applies "[i]n the event the underlying insurance shall not be applicable to any claim for reason that the [CAT] Fund shall assume or be required to assume primary responsibility for payment . . . ." West Penn contends that, where the CAT Fund assumes responsibility for payment, Endorsement #007 must not apply, because if Endorsement #007 applied even when the primary insurer did not actually pay the claim, the phrase "[i]nsofar as coverage is available" would be stripped of meaning.

In response, Lexington notes that the language of the two phrases differs: Endorsement #007 uses the word "available" while Endorsement #001 uses the word "applicable." Lexington contends that the PHICO policy may be generally *"available"*

---

[4]The dissent suggests that we have read in the claims-made reporting requirement because § 605 claims "must be timely reported the CAT fund." Contrary to the dissent's characterization, our conclusion that the Lieb claim was governed by Endorsement #007 was not driven by the fact that the CAT Fund is itself based on a claims-made model, for the reporting procedures for the CAT Fund have nothing to do with the reporting requirements under the Lexington policy. Rather, our opinion is driven by the language and structure of the Lexington policy itself.

13

even in situations where such insurance is not *"applicable"* to a specific claim because the CAT Fund took over responsibility for paying that claim. Lexington provides several other examples of when the PHICO policy would be available but not applicable to a specific claim, such as where the medical liability arose out of a criminal act or where PHICO did not have to pay because of its exhaustion limits. This reading highlights the important principle of Pennsylvania contract law, which requires courts to give effect to all of the language of the agreement whenever possible. *See Manor Mines, Inc.*, 565 A.2d at 432. Particularly in light of the foregoing discussion and the difficulties inherent in West Penn's approach, we accept Lexington's distinction between the terms "available" and "applicable," and find Endorsement #007 to govern the notice requirement for 605 claims.

Lastly, West Penn argues that even if the District Court's interpretation was reasonable, the agreement was ambiguous, and under Pennsylvania law, ambiguities should be resolved in favor of coverage. As we have explained, however, we do not believe the policy is ambiguous as to the notice requirements under the policy. *See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) ("[A] contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995)). Therefore, we hold that West Penn was required to abide by the PHICO policy's notice provisions, which required West Penn to report the Lieb claim during the policy period.[5]

---

[5]We also reject West Penn's reliance on *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193, 194 (Pa. 1977), which held that an insurer must show prejudice before it can deny coverage based on untimely notice, because we have determined that the Lieb claim is governed by a claims-made rather than an occurrence policy. While Pennsylvania courts have not directly addressed this issue, the available precedent has consistently held that the *Brakeman* rule is not applicable to claims-made policies. *See, e.g.*, *Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 210 F. Supp. 2d 658, 669 (E.D. Pa. 2002); *Borish v. Britamco Underwriters, Inc.*, 869 F.

14

### III. Was Notice Given to Lexington During the Policy Period?

West Penn argues that even if the Lexington policy required notice of the Lieb claim to be given during the policy year, there is a genuine issue of material fact whether West Penn gave Lexington notice prior to December 31, 2001. The District Court did not engage this argument, stating only that West Penn "concedes that it did not report the Lieb claim to Lexington until February 12, 2003."

There is certainly evidence to support the District Court's supposition that West Penn conceded its failure to report the Lieb claim during the policy period. West Penn's General Counsel, Paula Hooper, admitted in her affidavit that she did not provide notice until February 12, 2003. Moreover, the first written communication in the record that mentions the Lieb claim is a letter from the Hooper to Lexington dated February 12, 2003.

West Penn, however, points to two pieces of evidence which it contends establish a genuine issue that the Lieb claim was reported during the policy period: an internal Lexington document, called an HPL Create Sheet, and the deposition testimony of West Penn's Assistant General Counsel, Karen A. Barringer.

*A. The HPL Create Sheet*

---

Supp. 316, 319 (E.D. Pa. 1994); *City of Harrisburg*, 596 F. Supp. at 960-61. We are persuaded that the Pennsylvania Supreme Court would not extend the *Brakeman* rule to claims-made policies because such an extension of the notice period would defy the very purpose of a claims-made policy—that the claim be reported during the policy period. *See Continisio*, 17 F.3d at 69 ("[A]n extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, *gratis*, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." (quoting *Zuckerman v. National Union Fire Ins. Co.*, 495 A.2d 395, 406 (Pa. 1985)).

The "HPL Create Sheet" consists of a printed form, which has been filled out with handwritten notations, providing information such as the name of the insured, the claimant, the policy number, and a space for description of the loss. The form is dated August 20, 2003, and specifically refers to the Lieb claim. The key portion of the form, for our purposes, is a entry which originally read "Date of Loss." That phrase has been crossed out and "Date of RPT 12-31-01" is handwritten.

The only evidence in the record regarding the nature and purpose of this document is the deposition testimony of Denzil R. White, an employee of a Lexington affiliate, AIG Technical Services ("AIGTS"), who had been responsible for assembling documents produced in response to West Penn's discovery requests. White testified as follows:

> Q. What is an "HPL Create Sheet"?
> A. It's used by the department to get information about the claim and policy information to create the claim on our system.
> Q. This is the cover sheet that you use to give to your data processing people so that they would open files in Toolkit and LMS; isn't that right?
>  . . . .
> A. Yes.
>  . . . .
> Q. Do you complete these?
> A. No.
> Q. These are completed by the director, to your knowledge?
> A. To my knowledge, yes.
> Q. Can you identify this handwriting as the handwriting of Mr. Ruane?
> A: I am not sure.
>  . . . .
> Q. Do you have any reason to believe that "RPT" does not signify report?
>  . . . .
> A. I don't know what it means.
> Q. Have you made any inquiry of anybody to

determine who wrote that and what it means?

A. No.

. . . .

Q. Do you see the date at the top?

A. Yes.

Q. That is August 23, 2003, is it not?

A. Yes.

Q. Do you have any reason to believe that that is anything other than the date that this document was drafted and placed in your files?

A. I am not sure.

As a threshold matter, Lexington claims that the HPL Create Sheet is inadmissible either because it cannot be properly authenticated or because it is hearsay and not within any exception to the hearsay rule. We find, however, that the document is likely to be admissible. Nevertheless, the probative value of this document is insufficient to withstand summary judgment.

*1. Authentication*

While the point is extremely close, we conclude that the HPL Create Sheet meets the minimal requirements for authentication under Federal Rule of Evidence 901(a). Rule 901(a) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." We have repeatedly noted that "[t]he burden of proof for authentication is slight." *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985); *see also Link v. Mercedes-Benz of North America*, 788 F.2d 918, 927 (3d Cir. 1986). In *Link*, we elaborated on the standard for authentication of documents:

> [T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. *Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on*

17

> *admissibility.* Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.

788 F.2d at 928.[6] Applying this standard, in *United States v. McGlory*, 968 F.2d 309 (3d Cir. 1992), we held that handwritten notes met Rule 901's standard for authentication even though a handwriting expert could not definitely determine that the notes were in the defendant's writing, finding that the circumstantial evidence linking the notes to the defendant was sufficient. For example, we relied on the fact that the notes were found in the trash outside the defendant's residence, some of the notes were on paper from a notebook found in defendant's home, and the contents of the notes were consistent with defendant's use of initials and other code words. *Id.* at 330-31.

When we combine White's testimony with the circumstantial evidence of the authenticity of the document, in particular the fact that it was produced by Lexington pursuant to discovery requests, we believe that there is a sufficient foundation for a jury to determine that this document is what it is purported to be: a Lexington HPL Create Sheet. *See McQueeney*, 779 F.2d at 929 ("[T]he fact that the copies were produced by the plaintiff in answer to an explicit discovery request for his Sea Service Records, while not dispositive on the issue of authentication, is surely probative."); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 286 (3d Cir. 1983), *rev'd on other grounds,* 475 U.S. 574 (1986) ("[The exhibits] have the appearance, content, and substance typical of [board] minutes. They were produced by the

---

[6]Our Court has not precluded reliance on unauthenticated documents to oppose a motion for summary judgment, so long as they are ultimately "reduc[ible] to admissible evidence." *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n.12 (3d Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

18

defendants pursuant to a discovery order in this proceeding. They come from a source where such minutes are likely to be kept . . . . No more evidence was needed to establish a prima facie case of authenticity than the record contains.") (citations omitted); *see also Burgess v. Premier Corp.*, 727 F.2d 826, 835-36 (9th Cir. 1984) (holding that evidence found in defendant's warehouse was adequately authenticated simply by its being found there).

While it is troubling to us that the author of the handwritten notations remains unknown, and that White could not be sure of correct date, there does not appear to be any genuine dispute that the HPL Create Sheet was filled out by a Lexington employee for the purpose for which this sheet is typically used, *i.e.*, to search for data on a claim.

The real controversy between the parties on this issue relates to what the document purports to be (or more particularly, what it tends to prove). In Lexington's submission, the document is "evidence only of the HPL Create Sheet itself, not at all proof that West Penn reported the Lieb claim to Lexington during the policy period." But for authentication purposes, Rule 901(a) does not require the document to be probative of a particular fact, but requires only that there be sufficient evidence for a jury to conclude that the document "is what its proponent claims it to be." *See In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d at 285 (focusing "on the limited question of genuineness" to establish authenticity under Rule 901). Because we agree that the HPL Create Sheet is what it purports to be—a Lexington internal document used to retrieve information regarding claims—we conclude that the authentication requirement is satisfied.

*2. Hearsay*

Lexington submits that, even if the document can be authenticated, it is hearsay and does not fall into any exception to the hearsay rule under the Federal Rules of Evidence. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). We have doubts, however, that the declaration in question—the handwritten words "Date of RPT: 12/31/01"—constitutes a "statement" under the

19

hearsay rule. A "statement" is defined as an "oral or written assertion." Fed. R. Evid. 801(a)(1). The Advisory Committee Notes clarify that "nothing is an assertion unless intended to be one." Fed. R. Evid. 801(a) advisory committee's note.

White stated that the purpose of the HPL Create Sheet is to request information about a claim from the data processing department. In this sense, the information on the HPL Create Sheet is more in the nature of an inquiry than an assertion. Courts have held that questions and inquiries are generally *not* hearsay because the declarant does not have the requisite assertive intent, even if the question "convey[s] an implicit message" or provides information about the declarant's assumptions or beliefs. *Long v. Mayfield*, 905 F.2d 1572, 1579-80 (D.C. Cir. 1990); *see also United States v. Lewis,* 902 F.2d 1176, 1179 (5th Cir. 1990) ("While 'assertion' is not defined in the rule, the term has the connotation of a positive declaration. The questions asked by the unknown caller, like most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything." (citation omitted)); *see also* 5 *Weinstein's Federal Evidence* § 801.11[2] (2d ed. 2002).

For example, in *Long*, the D.C. Circuit held that an unidentified caller's inquiry into whether "Keith 'still had any stuff'" was not hearsay despite the clear inference from this statement that Keith in fact had "stuff" or that, more generally, Keith was involved in drug distribution. 905 F.3d at 1579-80. In *United States v. Jackson*, 88 F.3d 845 (10th Cir. 1996), the panel determined that the question "Is this Kenny?" was not hearsay under Rule 801(a)(1) and (c). The Court held that, even though "it might be possible to imply that the declarant believed [Kenny] was in possession of the pager and therefore he was the person responding . . . to the declarant's message . . . [t]he mere fact . . . that the declarant conveyed a message with her question does not make the question hearsay." *Id.* at 848.

In this case, White's deposition suggests that the HPL Create Sheet is an inquiry into whether the data processing department can find information on a claim based on certain criteria. Notwithstanding the fact that this inquiry could reveal

20

assumptions the declarant might have made about the Lieb claim—in particular that the date of report was December 31, 2001—we can infer from the HPL Create Sheet's purpose that the declarant was not making an assertion, but rather was asking a question, which does not constitute hearsay under Rule 801(a)(1) and (c).[7] Therefore, because we find that the HPL Create Sheet ultimately could be rendered admissible under the Federal Rules of Evidence, it can be used to oppose Lexington's summary judgment motion.[8] *Cf.* note 5, *supra*.

## 3. Genuine Issue of Material Fact

---

[7]Even if this document constituted an assertion, it would likely be admissible as an admission by a party opponent under Federal Rule of Evidence 801(d)(2)(D). Rule 801(d)(2)(D) provides: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." It is not disputed that a Lexington employee was responsible for filling out the HPL Create Sheet. As such, the writing is an admission by a party-opponent within the meaning of Rule 801(d)(2)(D), and thus would fall outside the proscription against hearsay.

Although we do not know how this employee gathered the information reflected on the HPL Create Sheet, or whether he or she had personal knowledge supporting the information, *see* Fed. R. Evid. 602, these are not requirements for admissibility under Rule 801(d)(2)(D). *See United States v. Ammar*, 714 F.2d 238, 254 (3d Cir. 1983); *Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626, 630-31 (8th Cir.1978) (holding that the personal knowledge requirement does not apply to Fed. R. Evid. 801(d)(2)(D)). Rather, it is sufficient under the Rule for the declarant to be a party's employee and to have made the declaration within the scope of the employment.

[8]We need not reach Lexington's contention that the HPL Create Sheet fails to satisfy the business record exception to the hearsay rule because this document is either not hearsay or would likely qualify as an admission of a party opponent, *see supra* note 6.

Notwithstanding the HPL Create Sheet's likely admissibility, this document can not preclude summary judgment because it has such minimal probative value that it could not be a basis on which a jury could find that West Penn had in fact reported the Lieb claim on or before December 31, 2001. White, who provides the only evidence in the record dealing with this document, could not discern the meaning of the notations on the HPL Create Sheet, identify the person who filled out the form, or even verify that the report was created on the date listed at the top of the form. Without further information about this form and the notations, a factfinder could not reasonably draw any inference from this document.

More specifically, White testified that the purpose of the document is to retrieve information about a claim from the data processing department. The purpose is not, for example, to record the date of report or other information about the claim—it is merely a search tool. As noted above, while the fact that the HPL Create Sheet is in the nature of an inquiry, rather than assertion, renders it admissible as not hearsay, this same fact also diminishes the probative value of the information on the sheet because, viewing the notation as an inquiry, it cannot be used to prove that the date of report was in fact December 31, 2001. *See United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("[A] question cannot be used to show the truth of the matter asserted . . . ."); *Headley v. Tilghman*, 53 F.3d 472 (2d Cir. 1995) (viewing a question as providing circumstantial evidence of the assumptions underlying the question, but not as probative of the truth of the items inquired about).

There is no evidence of why this unknown employee used December 31, 2001, as the inquiry date, or whether this employee had any basis for using such date other than the fact that this was the last day of the policy period. Additionally, the HPL Create Sheet is dated August 23, 2003, long after the end of the policy period. Thus, we agree with Lexington that, even viewing this document and White's testimony in the light most favorable to West Penn, the evidence shows at most that, more than a year and a half after the policy period, an unknown Lexington employee filled out the HPL Create Sheet to search for information about the

22

Lieb claim using December 31, 2001, as the report date.

While we may not weigh evidence at the summary judgment stage, we further note that, pitted against this cryptic document, is the affidavit of West Penn's General Counsel conceding that she notified Lexington of the Lieb claim on February 12, 2003—more than a year and a half after the policy period ended. Her February 12, 2003, letter makes no reference to prior communications between West Penn and Lexington, and simply provides a report of the claim. In light of this admission, and without any other information about this document, we do not believe a jury could reasonably rely on the HPL Create Sheet to find that West Penn in fact reported the claim prior to December 31, 2001. We therefore conclude that this document is not sufficient to create a genuine issue of material fact as to when West Penn reported the Lieb claim.

### B. Deposition and Affidavit of Karen A. Barringer

West Penn next points to the deposition testimony and affidavit of Karen A. Barringer, who served as West Penn's Assistant General Counsel during the relevant period. West Penn asserts that her testimony could establish that West Penn provided Lexington with notice of the Lieb claim at the 2001 year-end claims meeting.

Barringer's deposition testimony was as follows:

A. I know that Lexington had the loss runs. I know that the loss runs—or the claim was reported to PHICO and then to the CAT Fund in mid-year of '01. And I would find it hard to believe that it didn't make it to the loss runs, and I have to make the assumption that they had information about that claim from at least that source, and potentially others that I don't remember

. . . .

Q. Other than the PHICO loss runs that were presented, was there any other information that was presented to Lexington with respect to claims made to PHICO . . . [a]t the claims conference, at any other point during the policy period?

23

A. I am very comfortable that we touched on it at the claims conference. I would assume there are or were correspondence keeping Lexington apprised of cases as they were developing. But I don't specifically recall any piece of correspondence or any snippet of a conversation that I may have had.

Barringer's affidavit stated,

While I have no specific recollection of a discussion of the Lieb Claims at the 2001 Lexington claim review meeting, there were no questions for which responses were outstanding on December 31, 2001. I provided Lexington with all claim information that its claims staff requested at the meeting, including any information that Lexington may have requested regarding the Lieb Claims.

We disagree with West Penn that this evidence creates a genuine issue of material fact. Barringer admitted in both her deposition and her affidavit that she had no specific recollection of reporting or discussing the Lieb claim. Her belief that the claim was reported was predicated on her assumption that the claim was included in the loss runs which she provided to Lexington at the claims meeting.

While Barringer's deposition testimony that she "touched on" the Lieb claim at a claims conference appears at first blush to make this a close issue, and while juries often do resolve such conflicts in testimony, we agree with Lexington that this testimony is too speculative to defeat Lexington's motion for summary judgment. *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) (finding no genuine issue of material fact as to whether employer had knowledge of a sexual harassment incident where plaintiff could not "remember when or exactly what was said" in her discussion

24

with her supervisor).[9]

For the foregoing reasons, we conclude that West Penn has failed to establish a genuine issue of material fact as to the date of notice; hence, the District Court appropriately determined as a matter of law that notice was not given during the claims period.

## IV. Conclusion

As we have determined that West Penn was required to give notice during the policy period, and as there is no genuine issue of material fact that timely notice was given, we will affirm the order of the District Court granting summary judgment in favor of Lexington.

---

[9]Courts are particularly wary of forcing the opposing party to prove a negative at the summary judgment stage. *See Parker v. Sony Pictures Etm't Inc.,* 260 F.3d 100, 111 (2d Cir. 2001). If a document existed which could establish that notice was given, West Penn should have produced it, or explained through affidavits or other evidence why they could not do so. For example, the loss runs or the ongoing correspondence that Barringer mentioned in her deposition would affirmatively show notice was given during the claims period. West Penn, however, has thus far produced no evidence other than Barringer's speculation and the HPL Create Sheet that they contend shows that the Lieb claim was reported along with the other 2001 claims.

Fuentes, *Circuit Judge*, dissenting.

Contrary to the majority view, I believe that Endorsement # 007 of the Lexington Insurance Company ("Lexington") policy is inapplicable in this matter and that Western Pennsylvania Hospital ("West Penn") is entitled to excess coverage under the terms of that policy. Under those terms, where a claim, such as the Lieb claim, is not covered by West Penn's primary insurer (PHICO), but is instead covered by the Medicial Professional Liability Catastrophe Fund (the "CAT Fund"), the default notice provisions of the Lexington policy apply. Under those notice provisions, West Penn gave timely notice. Alternatively, even assuming that the majority's construction of the contract is correct, I believe West Penn has created a genuine dispute as to whether notice was timely given. I therefore respectfully dissent.

## A.

The central question here is whether West Penn was required to give Lexington notice of the Lieb claim by December 31, 2001, pursuant to Endorsement # 007, or within a "reasonable" time, pursuant to Endorsement # 001 and Lexington's default notice requirements. If West Penn is right that Endorsement # 007 does not apply, then under Pennsylvania's "notice-prejudice rule," Lexington may not refuse coverage unless it was prejudiced by late notice. *See Brakeman v. Potomac Ins. Co.*, 371 A.2d 193, 195-96 (Pa. 1977). As Lexington concedes it was not prejudiced, West Penn would be entitled to coverage.

The interplay between Endorsement # 001, Endorsement # 007, and § 605 (the CAT Fund) is critical to the notice issue. As the majority explains, if West Penn failed to notify Lexington of the Lieb claim within the policy period (January 1, 2001 to

26

January 2, 2002),[10] Lexington may refuse coverage if and only if Endorsements # 007 and # 001 are co-extensive with respect to § 605 claims like the Lieb claim. Lexington may not refuse coverage if those endorsements are alternatives to one another, i.e., if Endorsement # 007 applies only to PHICO claims and not to § 605 claims.

The plain language of the two endorsements at issue here clearly favors West Penn. Endorsement # 007 applies where "coverage is available to the Insured in the underlying insurance as set forth in the Schedule of Underlying Insurance." In other words, Endorsement # 007 would apply if the PHICO policy were available to West Penn. Endorsement # 001 applies "[i]n the event underlying insurance shall not be applicable to any claims for the reason that the Medical Professional Liability Catastrophe Fund [CAT Fund] shall assume or be required to assume primary responsibility for payment." That is, if the CAT Fund assumes responsibility for a claim, as it does here for the Lieb claim, then Endorsement # 001, not Endorsement # 007, applies.[11] Endorsement # 001 goes on to provide that the terms of the Lexington policy are otherwise unchanged. On its face, the Lexington policy in no way invokes the reporting requirements of the PHICO policy with respect to § 605 claims. As such, the Pennsylvania notice-prejudice rule applies, and since Lexington concedes it cannot show prejudice, it must provide West Penn with coverage.

The majority asserts that Endorsements # 007 and # 001

---

[10]As I discuss below, I believe West Penn has created a genuine dispute as to this fact.

[11]The majority points out that Endorsement # 007 refers to the "availab[ility]" of PHICO coverage while Endorsement # 001 refers to the "applicab[ility]" of PHICO coverage. Lexington's theory that a policy may be "generally" available for claims that the policy does not in fact cover is novel, but implausible. While a policy may be unavailable for any number of reasons, it is neither available nor applicable to claims for which coverage is explicitly excluded by the terms of the policy.

are complementary, largely on the grounds that both PHICO and § 605 claims are claims-based, rather than occurrence-based. As such, the majority reasons that it would be illogical to apply the default notice provisions of the Lexington policy to § 605 claims because those provisions are intended to apply to the otherwise occurrence-based coverage of the Lexington policy.

The majority is right in its assumption that the CAT fund operates on a claims-made model. Pennsylvania law provides that "[i]n the event that any claim is made against a [qualified] health care provider . . . more than four years after the breach of contract or tort occurred which is filed within the statute of limitations, such claims shall be defended and paid by the fund." 40 Pa. Stat. Ann. Tit. 40 § 1301.605.[12] In 1996, the statute was amended to trigger coverage only "if the fund has received a written request for indemnity and defense within 180 days of the date on which notice of the claim is given to the health care provider or his insurer." *Id.* This reporting requirement, consistent with traditional claims-made policies, is not subject to the *Brakeman* notice-prejudice rule. *See Pa. Med. Soc. Liab. Ins. Co. v. Commonwealth of Pa. Med. Prof'l Liab. Catastrophe Loss Fund*, 842 A.2d 379, 385-86 (Pa. 2004).

The majority is also right that claims-made policies almost always predicate coverage on reporting of a claim by the insured to the insurer within the policy period. "[A] 'claims-made' insurance policy represents a distinct bargained-for exchange between insurer and insured." *See Pizzini v. Am. Int'l Speciality Lines Ins. Co.*, 210 F. Supp. 2d 658, 668 (E.D. Pa. 2002). "An insurer obtains the benefits of a clear and certain cut-off date for coverage. In return, the insured typically pays a lower premium." Id.

Nevertheless, the usual reporting requirements for claims-

---

[123]Section 605 of the Health Care Act was later repealed by the Pennsylvania legislature when it reconstituted the CAT Fund as the Medical Care Availability and Reduction of Error Fund. See Act of March 20, 2002, P.L. 154, No. 13, § 5104(a)(2).

made policies cannot be read into an insurance policy to make it more economically sensible where those reporting requirements are not actually set forth in the policy. *See Harleysville Ins. Co. v. Aetna Casualty & Surety Ins. Co.*, 795 A.2d 383, 386-87 (Pa. 2002) ("[T]he standard for interpreting insurance policies does not allow us to focus solely on the nature of the policy and ignore the plain meaning of the policy terms."). Section 605 claims are 'claims-made' because the CAT fund operates on a claims-made model, not because they are covered by Endorsement # 007. The mere fact that § 605 claims are claims-based and that they must be timely reported to the CAT fund does not imply that, vis-a-vis Lexington, they are governed by Endorsement # 007 and PHICO reporting requirements. On its face Endorsement # 007's coverage is defined and limited to PHICO claims.

Moreover, Endorsement # 001, which indisputably does cover § 605 claims, does not provide that the reporting requirements of the CAT fund apply to Lexington's excessive coverage for § 605 claims (in the way that Endorsement # 007 provides that the reporting requirements of the PHICO policy apply to Lexington's excessive coverage for PHICO claims). Instead, Endorsement # 001 leaves the general notice requirements of the Lexington policy in place with respect to § 605 claims.[13]

_____

[134]Endorsement # 001 leaves all the general terms of the Lexington policy in place except insofar as they are contravened by the terms of the endorsement. The notice provisions of Lexington's general policy apply to claims covered by Endorsement # 001 because that endorsement does not set forth alternative notice requirements. By contrast, Lexington's general requirement that covered claims relate to incidents that occurred during the policy period does not apply because Endorsement # 001 explicitly provides excess coverage for § 605 claims, all of which arise more than four years after the underlying occurrences. Because Lexington's general policy requirements apply to § 605 claims *except insofar as they contradict the terms of Endorsement # 001*, the majority's worry that Endorsement # 001 is rendered

Lexington Insurance is correct that if it appears that Endorsement # 007 governs § 605 claims, its reporting requirements trump those of the general policy. *See St. Paul & Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981) ("If there is a conflict between the terms of the endorsement and those in the body of the main policy, then the endorsement prevails, particularly when it favors the insured."). "[W]hen a specific form of insurance is provided by an endorsement tailored to meet the particular needs of the insured and the company, that language must be followed to carry out the intentions of the parties." Id. at 524. However, in this case, the language of Endorsement # 007 gives no indication that it was tailored to § 605 claims. Endorsement # 007 appears on its face to have been intended to apply only to PHICO claims. Accordingly, the Lieb claim is governed by Endorsement # 001 alone, and Lexington's general notice requirements apply. Under Brakeman, Lexington may not deny coverage under those provisions because it was not prejudiced by any delay in notice.

At the very least, the fact that Endorsement # 007 was not written to capture § 605 claims renders the scope of its notice requirements ambiguous. If Lexington wanted to require that it be notified of § 605 claims by the close of the policy period, such a requirement would have been easy to articulate. Indeed, West Penn's Lexington excess coverage policy for the 2002 calendar year included Endorsement # 006, which expressly provided that excess coverage was available only if claims were made and reported to Lexington within the policy period. Lexington's "failure to utilize more distinct language" in the 2001 calendar year policy even though it was available "reinforces a conclusion of ambiguity under Pennsylvania law." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 105 (3d Cir. 1999) (quotations omitted). If the insurance policy is ambiguous, we must construe it in favor of the insured and West Penn prevails. *See Contrans, Inc. v. Ryder Truck Rental, Inc.*,

---

nonsensical under a literal reading because Lexington's occurrence-based requirements would exclude all § 605 claims, is unfounded.

836 F.2d 163, 168 (3d Cir. 1988); *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 905 (3d Cir. 1997). For the foregoing reasons, I would vacate the District Court's order of summary judgment and direct it to enter summary judgment in favor of West Penn.

B.

Even assuming that the majority's construction of the policy is correct, I would still vacate the order of summary judgment in favor of Lexington because West Penn has raised a genuine issue as to material fact that barred summary judgment. There is no doubt that if West Penn gave Lexington notice of the Lieb claim within the policy period, i.e., January 1, 2001 to December 31, 2001, the Lexington policy would have to provide excess coverage for Lieb's malpractice action. In the District Court, Lexington denied receipt of proper notice. West Penn, however, offered evidence from Lexington's own records that casts doubt on this denial of notice. Specifically, West Penn introduced a document entitled the "HPL Create Sheet." The document pertains to the Lieb claim and contains the following notation: "Date of Rpt: 12-31-01." In the HPL Create Sheet, Lexington appears to admit that the Lieb claim was reported to it within the policy period.

Moreover, while I agree with the majority that the testimony of Karen A. Barringer, West Penn's Assistant General Counsel during the relevant period, standing alone, may be insufficient to establish a timely report date, the existence of a file in Lexington's records consistent with her account (i.e., that West Penn notified Lexington of the Lieb in the very last days of the policy period) bolsters its reliability. Together with the HPL Create Sheet, her testimony meaningfully contests Lexington's claim that West Penn failed to give notice within the policy period. For this alternative reason, I would vacate the order granting summary judgment to Lexington and remand for resolution of the disputed issue as to the timing of notice.